WANATA, The (AVERY v.). See Case No. 677.

# Case No. 17,139.

## The WANDERER.

[1 Spr. 515; [1] 23 Law Rep. 139; 17 Leg. Int. 260.]

District Court, D. Massachusetts. June, 1860.

SLAVE TRADE—FORFEITURE OF VESSEL—INTENT—HOW PROVED—ACTS OF MASTER—IGNORANCE OF OWNER.

1. Under the second section of the act of 1818, c. 91 [3 Stat. 451], for the suppression of the slave-trade, it is not necessary, in order to subject the vessel to forfeiture, that the fitment should be complete.

2. Nor is it necessary that it should be peculiarly adapted to the slave-trade, if the illegal intent be otherwise shown.

3. But if the intent is to be inferred only from the character of the fitment, the latter must be such as to prove the illegal design.

4. Where any person, as master, fits out a vessel, with intent to employ her in the slave-trade, she is liable to forfeiture, although the

owner has never authorized any such illegal enterprise, and is ignorant of the master's intention.

This was a libel of information, by the district attorney, in behalf of the United States, claiming a forfeiture under the second section of the act of 20th April, 1818, c. 91. That section is as follows: "That no citizen or citizens of the United States, or any other person or persons, shall, after the passing of this act, as aforesaid, for himself, themselves, or any other person or persons whatsoever, either as master, factor, or owner, build, fit, equip, load, or otherwise prepare any ship or vessel, in any port or place within the jurisdiction of the United States, nor cause any such ship or vessel to sail from any port or place whatsoever within the jurisdiction of the same, for the purpose of procuring any negro, mulatto, or person of color, from any foreign kingdom, place, or country, to be transported to any port or place whatsoever, to be held, sold, or otherwise disposed of as slaves or to be held to service or labor; and if any ship or vessel shall be so built, fitted out, equipped, laden, or otherwise prepared, for the purpose aforesaid, every such ship or vessel, her tackle, apparel, furniture, and lading shall be forfeited."

J. A. Andrew and A. G. Browne, Jr., for claimants, made the following points: 1st. That the second section of the act of 1818 was not violated, so as to involve the forfeiture of the schooner, unless she was fitted or prepared for sea by Martin, "as master," acting in the ·work of fitment and preparation, as the agent of the owner, and that, as essential to his action, thus "as master," he must have been authorized by the owner, to fit and prepare the vessel for sea. 2d. That there is no evidence or pretence, that he was authorized by the owner to fit or prepare her for sea at all, much less to fit or prepare her for the slave-trade. 3d. That the evidence shows that, if Martin exercised any of the authority pertaining to a master at all, he did so by mere usurpation; and that his partial fitment and preparation for sea was surreptitious, tortious, and fraudulent, as to the owner. 4th. That such acts as were performed by Martin, and are relied upon by the government, as evidence that he was master of the schooner (although they are usually performed by that officer, and are competent in evidence), do not necessarily prove the fact; and that notwithstanding these acts, and the circumstances attending them, the truth being, and being made to appear, that Martin was a wrong-doer, they, as pieces of evidence, are to be regarded as successfully rebutted. In other words, that a man who is not master, does not become so by pretending that he is master, and acting the falsehood, as well as speaking it. 5th. That even although Martin had become "master" de facto, so as to bind the owner in respect to his ordinary contracts with seamen and material-men (they acting inno-

----

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

cently and bonâ fide), yet he could not forfeit the ship from the owner, unless he should be master de jure,—master as between the owner and himself; for otherwise he cannot be deemed, in the words of the statute, to have been "acting for" the owner in what he did. In other words, that one "as master" cannot forfeit a vessel, unless as "acting for the owner;" and that Martin was in no sense acting for [G. B.] Lamar, but was acting against him. 6th. That there was no such characteristic fitment or preparation for sea, as to show that a slave voyage was intended. 7th. That the declarations made by Martin, as to his own unlawful intention, cannot affect the vessel, because only the owner, or a real and lawful master or factor, could so impress his own mind and intent upon the vessel, as to affect its character, to the detriment of the owner. 8th. That the only fitment or preparation for sea, which was made at all, was the hasty, secret, and imperfect preparation, which Martin made, to enable him to steal the vessel; and that such a fitment, made by a felon, in fraud both of the owner and of the government, to enable him to steal the vessel, is not the fitment intended by the statute, nor are the words or acts of such a felon, said or done in the pursuance of his felonious intention, capable of affecting either the owner or the res. 9th. That even if Martin could affect the vessel by his own intention, there was no clear intention in his mind beyond the appropriation of the vessel to his own use; that he had no money, nor credit, nor other means of obtaining a slave cargo; that he had no accommodations for a cargo of slaves, nor such an outfit as is characteristic of a slaver; that he was merely a general pirate, intending to get what he could, and actually getting what he could, by artifice, and intimidation, and fraud, from vessels which he boarded, and from merchants, at ports where he stopped, and pursuing an aimless career over the seas, subject to such variations as his own caprice, or the accidents of fortune, might suggest.

And they cited The Emily and The Caroline, 9 Wheat. [22 U. S.] 381; The Plattsburgh, 10 Wheat. [23 U. S.] 133; U. S. v. Gooding, 12 Wheat. [25 U. S.] 460.

C. L. Woodbury, Dist. Atty., for the United States, cited U. S. v. Gooding, 12 Wheat. [25 U. S.] 460; St. Jago de Cuba, 9 Wheat. [22 U. S.] 409; The Porpoise [Case No. 11,284]; The Catharine [Id. 14.755]; U. S. v. Morris, 14 Pet. [39 U. S.] 464; U. S. v. Quincy, 6 Pet. [31 U. S.] 445.

SPRAGUE, District Judge. This controversy resolves itself into two questions: 1st. Was this vessel fitted out or prepared with intent to employ her in the slave-trade? And if so, 2d. Was this done by any person, "as master, factor, or owner?"

On the night of the 18th of October last, the Wanderer went to sea, from the port of Savannah, under the command of one Martin, with a full crew of officers and men, all shipped for that purpose at Savannah. Some of the crew had been on board of her, fitting her for sea, for several days before she sailed, during which time water had been taken in, stores purchased and put on board, to the amount of nearly $2000. Her sails were taken from the shore and bent, and other preparations made. These acts were all done by Martin, as master, and constituted a fitting or preparing of this vessel for sea. Was it done with intent that she should be employed in the slave-trade? The conduct of Martin, and the manner in which this vessel went to sea, demonstrate that he was intent upon some unlawful enterprise. Most of the stores were hurriedly taken on board, in the evening of the 18th of October, and during the darkness of the same night, he hoisted sail, and went down the river, taking with him two seamen, who had just before come alongside in a boat, which had been employed by one Black, to convey him to the vessel; and these two men were compelled, against their will, to go the voyage. The vessel escaped from the port, without any clearance from the custom-house, without charts or books of navigation, and so suddenly that none of the crew were allowed time to take their clothing from the shore, and many of them were coerced by threats, and a display of deadly weapons. Upon what illegal enterprise was Martin intent? Here it has been made a question whether his own declarations of his purpose are admissible in evidence. As the fitment was all made by him, and the vessel went to sea under his command, there can be no doubt, that what was said at the time of doing these acts, as explanatory of, or giving them character, are admissible as part of the res gestæ. To Hussey, the shipping-master, who was employed by him to engage the crew, ostensibly for a voyage to Matanzas, he declared that "he had been in the slave-trade, and was going into it again." And before the vessel left the river, while near its mouth, Martin prepared shipping articles,—describing the voyage to be to Saint Helen's Sound, a place on the coast of Africa,—which all the crew signed. This they were induced to do by a free use of intoxicating liquors, and a display of pistols. And, before leaving the river, Martin repeatedly declared that he was going for a cargo of "blackbirds," that is, negroes. Upon getting to sea, instead of going to Matanzas, he shaped his course for the Western Islands, and arrived at Flores in thirteen days, with no deviations, except for the purpose of speaking other vessels, in order to obtain charts and supplies. At Flores he took on board a quantity of provisions, and then escaped furtively, without paying for them, and soon after arrived off Funchal, in the Island of Madeira; but seeing a man-of-war in port, he put to sea, directing his course for the coast of Africa. A few days after this, falling in with a French bark, he went on board of her with a boat's crew, and in his absence, the mate, with the concurrence of the crew, took the command, changed her course, brought her to Boston, and delivered

her up to the officers of the revenue. These facts clearly show that the Wanderer was fitted for sea by Martin, with intent to employ her in the slave-trade. In the cases cited by the counsel, it was held, that the fitment need not be complete, but that any preparations for the unlawful purpose are sufficient. The Emily and The Caroline. 9 Wheat. [22 U. S.] 381; The Plattsburgh. 10 Wheat. [23 U. S.] 133; U. S. v. Gooding. 12 Wheat. [25 U. S.] 460. But it is insisted, that here the fitment was not only incomplete, but that no part of it was exclusively or peculiarily adapted to the slave-trade. But such adaptation is not necessary, where the intent is otherwise proved. Where the character of the fitment is the only evidence of the illegal purpose, it must be such as to prove such purpose. And if the preparations be only such as are made for innocent voyages. no criminal intent can be inferred from it; but if the criminal intent be proved aliunde, then any fitting for sea, coupled with such intent, satisfies the language and spirit of the statute.

As to the second question. Was this fitting out for the slave-trade made by Martin as master? When the Wanderer sailed, and for several months before, she was owned by Charles A. L. Lamar, of Savannah, who had purchased her under a decree of condemnation for having been a slaver. Eight or ten days before she went to sea, Martin, by consent of Lamar. took actual possession and control of her. and acting as master, shipped a crew, purchased stores upon the credit of the vessel, and otherwise prepared her for sea, with intent, on his part. to engage in the slave-trade. But it is insisted, that this was not done by him as master, within the meaning of the statute. unless he was actually authorized so to fit the vessel for that trade; that if Lamar only intended and authorized a fitment by Martin. as master, for a lawful voyage. it would not be sufficient, and that there must be a criminal intent on the part of the owner. To this doctrine I can by no means accede. The words of the statute are—"if any person . . . as master . . . shall fit . . . or prepare a vessel with intent," &c. The acts and intention of Martin bring the case within the words of the statute, and they are clearly within the mischief which it was intended to suppress. If all the illegal acts and purposes must be authorized by the owner, then they are his acts and intention by his authorized agent, and the words "master or factor" are without meaning. and might be wholly omitted. without impairing the force or effect of the statute. The construction contended for, will not only violate the language, but defeat the purpose of the act. For an owner might send his vessel on a lawful voyage to New Orleans, for example. and there his master fit her out for the slave-trade; nay, even in the home port, the owner has only to keep behind the curtain, while the master is fitting his vessel for the criminal enterprise, and make, at the proper time, such declarations and manifestations as may repel the presumption of

complicity, and the vessel will be liable to no forfeiture. But it is urged, that it is unjust to deprive the owner of his property, when he has been guilty of no criminal purpose. No doubt it may sometimes bear hard upon innocent owners. But this hardship is imposed by the general policy of our laws. when vessels are employed for criminal purposes. For example. smuggling goods to the value of $400 may subject a ship to forfeiture, however innocent the owners. And seizures for such cause are frequent. Even the Cunard steamers have been arrested more than once, in this port, because a few hundred dollars' worth of goods had been smuggled on shore. without a suspicion that the owners. or even the officers, were in any degree implicated in the illegal act. The legislature, to insure not only good faith, but the utmost vigilance on the part of the owners, says to them emphatically, you must, on peril of losing your vessel, see to it that she shall not be made use of as an instrument for violating the law. And if this is deemed necessary, merely for the protection of the revenue, for a much stronger reason should it be enforced against vessels to prevent their being used as instruments to carry on a trade, which not only in the eye of morality. but also in the eye of the law. is the most atrocious that man can be engaged in. We must recollect, that a traffic so denounced and so criminal. will assume every disguise. false pretence and deception, which fraud and ingenuity can devise. and calls for the most stringent measures for its prevention; one of which is to enlist the owner of the vessel to prevent her being so employed in violation of law, by holding him responsible for such use to the extent of his ownership.

For these reasons, I do not think it necessary to go into the question which has been so much contested, whether Lamar had knowledge of Martin's criminal intent. It is said by the claimant that Martin had contracted to purchase three-fourths of the Wanderer for the sum of $20,000. and that he was permitted to go into possession. and control her, in the confident expectation that he would speedily become the major owner. But this explanation goes only to the guilt or innocence of Lamar. and leaves the fact of the actual control. and the acts and purposes of Martin. as master, untouched. In this case. Martin was in possession. with the consent of the owner, and I am not called upon to decide what would have been the result. if he had been a mere trespasser from the beginning. When that case shall arise. and an owner shall leave his vessel so exposed, that a wrong-doer can seize, fit, and convert her to such unlawful purpose, it will be for the court to consider. whether both the language and the spirit of the law do not require her condemnation. But that question is not now before me. This vessel, her tackle. apparel. furniture, and lading. must be decreed forfeit.

NOTE. [from 23 Law Rep. 139]. There were two other cases in the district court connected

with the Wanderer. One was a libel in rem, brought by Weston, the mate, and the crew, for their wages; the other was a libel in rem by the same parties for salvage; they having brought her into the port of Boston, as stated in the above opinion. The claim for wages was objected to, because, first, the crew knowingly and willingly sailed on the illegal voyage; and, second, because the owner of the Wanderer did not give the master such authority as would give the seamen he employed a lien on the vessel for their wages. Both objections were overruled, and the claim for wages was allowed, except as to the mate, who was held not to have been ignorant of the purposes of the voyage. The libel for salvage was dismissed, because, to entertain it, the libellants should have saved the vessel from something. They could have saved her only from forfeiture for being engaged in the slave-trade; and, as the vessel was decreed forfeited, they had no reason to be compensated for any salvage service. W. H. Judson was counsel for libellants; Messrs. Andrew and Browne, for the claimant.